# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**ADAM LENKOWSKY**
ROBERTS & BISHOP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**DAVID L. STEINER**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Feb 21 2012, 9:32 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PAUL K. OGDEN, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1101-CT-45 |
| | ) | |
| STEPHEN ROBERTSON, et al., | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Dreyer, Judge
Cause No. 49D10-0802-CT-7777

**February 21, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Paul K. Ogden (Ogden), appeals the trial court's summary judgment in favor of Appellees-Defendants, Stephen Robertson, *et al*. (Robertson), with respect to Ogden's wrongful termination claim.[1]

We affirm.

## ISSUES

Ogden raises four issues on appeal, three of which we find dispositive and restate as follows:

(1) Whether Ogden's memorandum in which he raised legal violations, a hostile work environment, and mismanagement was protected speech under the Indiana Constitution;

(2) Whether Ogden was entitled to due process protections under State personnel policy and Executive Order 05-14; and

(3) Whether the trial court had subject matter jurisdiction over Ogden's claim that he was wrongfully terminated from his employment.

## FACTS AND PROCEDURAL HISTORY

On November 6, 2006, Ogden was hired to be a Division Manager at the Title Division of the Indiana Department of Insurance (IDOI). For State personnel purposes, the position was classified as a grade Executive Broad Band (EXBB) position. The

---

[1] We held an oral argument in this case on December 6, 2011, at Rensselaer Central High School in Rensselaer, Indiana. We thank Rensselaer Central High School for its hospitality in hosting the argument and counsel for their excellent advocacy.

2

EXBB job classification includes positions such as Directors, Department Heads, and Agency Heads. At the time Ogden was hired, James Atterholt (Commissioner Atterholt) was the Commissioner of the IDOI, and Carol Mihalik (Mihalik) was a Chief Deputy Commissioner and head of the Consumer Protection Unit (CPU). Organizationally, the Title Division was a part of the CPU, and Ogden reported to Mihalik.

Between three to six months into his employment, Ogden began verbalizing frustrations to Commissioner Atterholt regarding Mihalik's supervision. Ogden told Commissioner Atterholt that Mihalik exhibited wild mood swings, was forgetful, had mental health problems, and had trouble focusing on issues the title managers brought to her attention. Ogden also complained that Mihalik was a poor manager and frequently created obstacles to his work.

In one meeting between Ogden and Commissioner Atterholt, they discussed the preparation of insurance bulletins, which are bulletins that the IDOI uses to convey its policy decisions and interpretations to its regulated community. Ogden informed Commissioner Atterholt that Mihalik had told him that Commissioner Atterholt did not want to issue insurance bulletins. Commissioner Atterholt denied such statements, and Ogden began to work on developing bulletins after the meeting. However, Commissioner Atterholt and Ogden had two different interpretations of their conversation regarding the bulletins. Commissioner Atterholt thought that Ogden was getting a consensus from the Title Division regarding the need for bulletins, while Ogden thought that Commissioner Atterholt had told him to work around Mihalik to develop bulletins.

3

Ogden drafted bulletins and sent them to the title industry, which caused confusion because the industry leaders believed that the draft bulletins would eventually become the final bulletins.

When Mihalik discovered that she had not seen the draft bulletins, she became concerned and wrote Ogden a "counseling letter" on September 12, 2007. In the counseling letter, Mihalik claimed that Ogden had violated IDOI policies in drafting the bulletins and reminded him that he should not disseminate draft title insurance bulletins to the industry unless she and Commissioner Atterholt had approved the bulletins. She intended the letter as a "heads up as to certain behaviors so that [they] could talk about it and get him back on track," rather than as a disciplinary measure. (Appellant's App. p. 173). Accordingly, Mihalik filed the letter in a personal fact file she kept for each employee, in which she saved employee information to refresh her memory when it came time to complete performance appraisal reports. She did not give the letter to the State Personnel Department to be included in Ogden's official personnel file.

On September 14, 2007, Ogden met with Joyce Crull (Crull) and Nancy Tunget (Tunget) of the State Personnel Department to file a formal complaint alleging that Mihalik had committed personnel and legal violations, misused the title insurance dedicated fund, and created a hostile work environment in the CPU. Crull and Tunget informed Ogden that they would conduct an investigation and interview the employees of the CPU on a day when Mihalik was out of the office. In the meantime, they instructed Ogden to start collecting specific information regarding the alleged violations.

4

Subsequently, in a letter dated September 17, 2007, Ogden submitted a response to Mihalik's counseling letter in which he denied that he had violated any internal procedural policies. Ogden also, in a memorandum dated the same day, made a formal request to Commissioner Atterholt that he remove the Title Insurance Division from the CPU so that the Division would operate under a different Chief Deputy. Ogden's memorandum outlined 35 reasons for his request, including allegations of Mihalik's poor management, vindictiveness towards employees, misuse of dedicated funds, violation of personnel rules, and knowing publication of false regulatory action data on the IDOI website. Ogden closed his letter stating:

> For the foregoing reasons I would respectfully request that the Title Insurance Division be moved out of the [CPU], effective immediately. The impending move to the first floor, which would otherwise result in the [CPU] being divided into two floors, provides the perfect opportunity to make such a structural change to the management of the Department. Further, I would ask you to counsel [Mihalik] and others that they are not to retaliate, in any fashion, against me or any other employee, for my making this formal request.

(Appellant's App. p. 187).

Later in the day on September 17, 2007, IDOI General Counsel Doug Webber (Counsel Webber) told Ogden to come to the third floor conference room for a mandatory pre-deprivation meeting. Before Counsel Webber and Ogden reached the meeting, Counsel Webber informed Ogden that the decision had already been made to terminate Ogden if he did not resign. When Ogden arrived, there were four people in attendance at the meeting: Commissioner Atterholt, Counsel Webber, Mihalik, and Tunget. Counsel Webber presented Ogden with two letters—one labeled resignation and one labeled

5

termination—and offered Ogden the choice as to which letter to sign. Ogden asked what he had done, and Counsel Webber responded that he had been "out of line" when he sent his memorandum requesting Commissioner Atterholt to reorganize the Division (Appellant's App. p. 290). Commissioner Atterholt had interpreted Ogden's memorandum as an ultimatum and was not willing to restructure IDOI in order to move the Title Insurance Division. Also during the meeting, Ogden spoke with Tunget alone and asked her whether the investigation of Mihalik would continue if he resigned. She responded that it would not continue because complaints could only be filed by employees, and he would no longer be an employee if he resigned or was terminated. Following his conversation with Tunget, Ogden agreed to resign. When he returned to his office, Ogden discovered that the hard drive for his computer had been removed during the pre-deprivation meeting.

On February 20, 2008, Ogden filed a Complaint against the IDOI, Commissioner Atterholt, and Mihalik (collectively, the IDOI defendants), alleging violations of the First and Fourteenth Amendments of the United States Constitution; Article I, section 9 of the Indiana Constitution; the Whistleblower Law (WBL); Indiana Code § 4-15-10-5; and state due process.[2] Ogden also alleged that the IDOI defendants had intentionally caused him emotional distress. Because some of the allegations arose under federal law, the IDOI defendants removed the case to the United States District Court. The district court

---

[2] Stephen Robertson is the current Commissioner of the Indiana Department of Insurance. Commissioner Atterholt remains a named defendant for individual capacity claims.

dismissed Ogden's First Amendment claims on the premise that Ogden had acted as an employee rather than as a citizen when he presented Commissioner Atterholt with his memorandum. The district court also declined to exercise its supplemental jurisdiction to rule on the state law claims. The Seventh Circuit Court of Appeals affirmed the district court's ruling and clarified that the district court had not ruled on Ogden's due process claim under state law. The seventh circuit remanded all of Ogden's state law claims back to the trial court.

Upon remand, on May 17, 2010, both Ogden and the IDOI defendants filed motions for summary judgment. On January 5, 2011, the trial court granted summary judgment to the IDOI defendants, finding that the WBL provided no private cause of action for which Ogden could seek relief through a civil lawsuit, that Ogden's September 17, 2007 memorandum was not protected speech under Article I, section 9 of the Indiana Constitution, and that the same memorandum was not the motivating factor in his forced resignation.

Ogden now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Warren v. Warren,* 952 N.E.2d 269, 269 (Ind. Ct. App.

7

2011). Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id.* The grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

## I. *Article I, § 9 of the Indiana Constitution*

First, Ogden asserts that the IDOI defendants violated his right to free speech guaranteed by Article I, section 9 of the Indiana Constitution. Art. I, § 9 specifies that "[n]o law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for abuse of that right, every person shall be responsible." The IDOI defendants suggest that our standard of review of this issue should mirror the standard of review used to address violations of the First Amendment of the United States Constitution, as both relate to the protection of free speech. However, as we determined in *Lach v. Lake County,* 621 N.E.2d 357, 358 (Ind. Ct. App. 1993), *trans. denied,* which the IDOI defendants cite in

support of their argument, "the Indiana Constitution more jealously protects freedom of speech guarantees than does the United States Constitution."

Based on this premise, Indiana courts have employed a two-step analysis when addressing Art. I, § 9 claims. *Blackman v. State,* 868 N.E.2d 579, 584 (Ind. Ct. App. 2007), *trans. denied.* First, we must determine whether the state action has restricted a claimant's expressive activity. *Id.* at 584-85. Second, if it has, we must decide whether the claimant's restricted activity constituted an "abuse" of the right to speak. *Id.* at 585. Generally, when we review the State's determination that a claimant's expression was an abuse of the right of free speech under the Indiana Constitution, we need only find that the determination was rational. *Id.* If a claimant demonstrates that the right to speak clause is implicated, he or she retains the burden of proving that the State could not reasonably conclude that the restricted expression was an "abuse." *Whittington v. State,* 669 N.E.2d 1363, 1369 (Ind. 1996).

However, if the expressive activity is political in nature, the State must demonstrate that it did not materially burden the claimant's opportunity to engage in political expression. *Blackman,* 868 N.E.2d at 585. "Expressive activity is political . . . if its point is to comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for office or criticizing the conduct of an official acting under the color of law." *Whittington,* 669 N.E.2d at 1370. In contrast, where an individual's expression focuses on the conduct of a private party—including the speaker himself or herself—it is not political. *Id.* If the expression, viewed in context, is

9

ambiguous, a reviewing court should find that the claimant has not established that it was political and should evaluate the constitutionality of any state-imposed restriction of the expression under a rationality review. *Id.* Once a claimant succeeds in demonstrating that his or her expression was political, the State may demonstrate that its action did not impose a material burden on the expression if either the "magnitude of the impairment" was slight or the expression threatened to inflict "particularized harm" analogous to tortious injury on readily identifiable private interests. *See id.*

Although we have never directly addressed the application of Art. I, § 9 within the context of a termination of employment before, we conclude that our analysis should follow the general two-step analysis for Art. I, § 9 claims. However, in spite of our adoption of Ogden's suggested standard of review, we cannot agree that his speech was protected under Art. I, § 9. Because Ogden's speech was addressed to the State rather than a private individual and commented on the State actor's actions, we conclude that his speech was political. We determine, though, that the State's request that Ogden resign only slightly impaired his expression, and therefore was not material, as the *purpose* of his expression was not political. From our review of Ogden's memorandum to Commissioner Atterholt, it is clear that he was acting within the scope of his employment because he requested a change or an improvement in his employment situation, which served a strictly private purpose. In particular, Ogden did not request that Commissioner Atterholt investigate Mihalik's alleged regulatory and personnel violations; instead, he concluded his letter stating, "For the foregoing reasons I would

10

respectfully request that the Title Insurance Division be moved out of the Consumer Protection Unit, effective immediately." (Appellant's App. p. 187). Therefore, it is clear that his purpose was merely to reorganize his division so that he would not have to report to Mihalik anymore, which does not have any public effect on her alleged violations. Accordingly, we conclude that the trial court did not err in finding that the IDOI defendants did not violate Ogden's right under Art. I, § 9.

## II. *Due Process Rights*

Next, Ogden argues that the IDOI defendants wrongfully deprived him of the due process he should have received under State personnel policy and Executive Order 05-14 (EO 05-14). State personnel policy establishes that

> [d]isciplinary action should be taken only after a full and fair investigation. Suspensions without pay, demotions, or dismissals may be imposed on regular employees in the merit service or on non-merit employees with complaint rights pursuant to [Executive Order 05-14 (EO 05-14)] only after a predeprivation meeting has been held with the employee explaining the nature of the allegations and the evidence supporting disciplinary action, and providing the employee an opportunity to explain his/her actions.

(Appellant's App. p. 476). According to Ogden, he was protected by this policy as a non-merit employee with complaint rights under EO 05-14. Pursuant to EO 05-14:

> An employee of the non-merit service, as defined in 31 IAC 1-1-1, who:
>
> > i. Does not have standing to file a complaint under a statute or rule,
> > ii. Has at least six (6) months of continuous full-time or twelve (12) months of continuous part-time employment,
> > iii. Is not classified in the [Executive, Scientific and Medical (ESM)] or [Supervisors and Managers (SAM)/Professional, Administrative, and Technological (PAT)] job categories, and

11

iv.  Is not employed on a temporary or intermittent basis[3]

may file a complaint concerning the employee's dismissal, demotion, or suspension without pay.

EO 05-14.  In response, the IDOI defendants argue that Ogden was not protected by EO 05-14 because Ogden's job position was classified as EXBB, which, according to the State, was a subclassification of the ESM category.

In support of their contention, the IDOI defendants submitted 2006 and 2007 State of Indiana Pay Plans illustrating EXBB as being a subcategory of the ESM classification. The Pay Plans include lines delineating the boundaries between each of the categories, and EXBB is included in the same section as ESM.  In response, Ogden submitted a web page description of the job categories and pay plan that described each individual category.  The trial court concluded that "[t]he web page shows general information about the categories, but does not indicate how each job is classified or the State's job code listings." (Appellant's App. p. 21).  We agree with the trial court that the web page was not meant to be a delineation of the classifications of each category, but rather a general description of the positions encompassed in each category.  Correspondingly, the page even expresses that it is to be used as a "general guideline."  As the Pay Plan specifically illustrates that EXBB is a subcategory of ESM and Ogden's submitted

---

[3] According to the web page description of the job categories Ogden submitted, the ESM job category includes positions such as Directors, Department Heads, or highly specialized occupations.  The occupations in the SAM category require a level of formal education which ranges from completion of high school through an advanced college level degree, depending upon both the job category supervised and level of job in the supervisory hierarchy.  The PAT job category includes occupations that require specialized or theoretical knowledge through college training or through extensive work experience that requires on-going training.

webpage is only a general illustration of the positions included in each category, we conclude that the trial court did not err in determining that EXBB is a subcategory of ESM. Therefore, Ogden did not derive due process rights from EO 05-14.

## II. *Subject Matter Jurisdiction*

Finally, Ogden disputes the trial court's determination that it did not have subject matter jurisdiction to hear Ogden's claims under the WBL or under common law. This issue has multiple parts. First, the trial court concluded that the WBL does not create a private right of action and that, even if it does, Ogden did not properly exhaust his administrative remedies as required under the WBL before seeking judicial review. Second, the trial court concluded that Ogden does not have a cause of action under common law. We will address the issue of exhaustion of administrative remedies under the WBL and Ogden's common law claim, but we will not address the issue of whether the WBL creates a private right of action, as we determine that Ogden improperly failed to exhaust his administrative remedies.

## A. *The Whistleblower Law*

The WBL is codified at I.C. § 4-15-10-4 and provides that:

(a) Any employee may report in writing the existence of:
    (1) a violation of a federal law or regulation;
    (2) a violation of a state law or rule;
    (3) a violation of an ordinance of a political subdivision (as defined in
      [I.C. §] 36-1-2-13); or
    (4) the misuse of public resources;
to a supervisor or to the inspector general.
(b) for having made a report under subsection (a), the employee making the report may not:
    (1) be dismissed from employment;

13

(2) have salary increases or employment related benefits withheld;

(3) be transferred or reassigned;

(4) be denied a promotion the employee otherwise would have received; or

(5) be demoted.

(c) Notwithstanding subsections (a) and (b), an employee must make a reasonable attempt to ascertain the correctness of any information to be furnished and may be subject to disciplinary actions for knowingly furnishing false information, including suspension or dismissal, as determined by the employee's appointing authority, the appointing authority's designee, or the ethics commission. However, any state employee disciplined under this subsection is entitled to process an appeal of the disciplinary action under the procedure as set forth in [I.C. §] 4-15-2-34 through [I.C. §] 4-15-2-35.5.

(d) An employer who knowingly or intentionally violates this section commits a Class A misdemeanor.

The provision at issue here is section (c), which provides for an administrative appeals process if an employee is disciplined for blowing the whistle. Ogden argues that because the language merely provides that an employee "is entitled" to the appeals process, the appeals process is not a mandatory pre-requisite to judicial review. In response, the IDOI defendants claim that because the statute specifies an administrative remedy, that remedy is the exclusive remedy and must be exhausted prior to judicial review.

We acknowledge that there is a strong bias in our case law in favor of the requirement that administrative remedies be exhausted. *Koehlinger v. State Lottery Com'n of Indiana,* 933 N.E.2d 534, 538 (Ind. Ct. App. 2010), *trans. denied.* The objective of such a requirement is "to avoid collateral, dilatory action, ensure the efficient, uninterrupted progression of administrative proceedings and the effective application of judicial review, and provide an agency with an opportunity to correct its own errors and to compile a factual record as necessary for judicial review." *Id.*

14

Accordingly, there is a basic principle of Indiana administrative law that a claimant who has an available administrative remedy must exhaust that administrative remedy prior to seeking judicial review. *Dennis v. Bd. of Public Safety of Fort Wayne,* 944 N.E.2d 54, 60 (Ind. Ct. App. 2011).

However, there are exceptions to the exhaustion requirement. For instance, a party is excepted from the requirement when the remedy is inadequate or would be futile, or when some equitable consideration precludes application of the rule. *Smith v. State,* 701 N.E.2d 926, 931 (Ind. Ct. App. 1998), *trans. denied.* To prevail upon a claim of futility, "one must show that the administrative agency was powerless to effect a remedy or that it would have been impossible or fruitless and of no value under the circumstances." *Id.* (quoting *Indiana State Bldg and Constr. Trades Council v. Warsaw Cmty. School Corp.,* 493 N.E.2d 800, 806 (Ind. Ct. App. 1986)). The exhaustion requirement will be relaxed when there is grave doubt as to the availability of the administrative remedy. *Smith,* 701 N.E.2d at 931.

Because we have previously recognized that it is a basic principle of Indiana law that a claimant who has an available administrative remedy must exhaust that administrative remedy before seeking judicial review, we conclude that the language "is entitled" does not indicate that administrative review is only a permissive prerequisite to judicial review. *See Dennis,* 944 N.E.2d at 60. Nor do we find merit in Ogden's argument that his claim qualifies as an exception to the exhaustion requirement due to its complex nature. We cannot see how his claim is different than any other claim that could

be filed under the WBL. The legislature made it clear that it viewed the administrative appeals process as capable of handling such claims when it provided for such a remedy in the WBL.

## B. *Common Law*

Alternatively, Ogden claims that *Cantrell v. Morris,* 849 N.E.2d 488, 495 (Ind. 2006) and *Baker v. Tremco,* 917 N.E.2d 650, 654 (Ind. 2009) established that when an employee is discharged solely for exercising a statutorily conferred right, an exception to the general common law rule of employment at will must be recognized. Ogden misinterprets these precedents.

Indiana follows the doctrine of employment at will, under which employment may be terminated by either party at will, with or without a reason. *Baker,* 917 N.E.2d at 653. The presumption of employment at will is strong, and Indiana courts have been disinclined to adopt broad and ill-defined exceptions to the doctrine. *Id.* Nevertheless, this court has recognized three exceptions. *Id.* First, if an employee establishes that "adequate independent consideration" supports the employment contract, the court will generally conclude that the parties intended to establish a relationship in which the employer may terminate the employee for good cause. *Id.* at 653-54. Second, we have acknowledged a public policy exception to the doctrine if clear statutory expression of a right or duty is contravened. *Id.* at 654. Third, this court has accepted that an employee may invoke the doctrine of promissory estoppel by pleading the doctrine with particularity, demonstrating that the employer made a promise to the employee, that the

16

employee relied on the promise to his detriment, and that the promise otherwise fits within the Restatement test for promissory estoppel. *Id.* Ogden asserts that he has an action under the second exception to the employment at will doctrine because the IDOI defendants contravened his clear statutory right to protection under the WBL.

In support of his assertions, Ogden points to *Baker,* in which an employee was allegedly wrongfully discharged for refusing to participate in a scheme to sell roofing products that violated public bidding laws and defrauded Indiana public schools. *Id.* at 653. On appeal, the supreme court noted that the public policy exception is a "separate but tightly defined exception to the employment at will doctrine" when an employer discharges an employee for refusing to commit an illegal act for which the employee would be personally liable. *Id.* at 654. Ultimately, the supreme court held that Baker did not have a common law claim under the exception to employment at will, because at its heart his claim rested on his allegation that the roofing activities conducted under an established statutory framework contravened *other* statutes about bidding public projects. *Id.* at 656.

We do not find this case relevant because the supreme court specified that the exception is "tightly defined" and applies to employees who refuse to commit illegal acts for which they would be "*liable.*" *Id.* at 654. Ogden has not clarified how he would be liable for Mihalik's alleged personnel and regulatory violations.

In addition, Ogden points to *Cantrell* to support his contention that his claim falls within a common law exception to the employment at will doctrine. The *Cantrell* court noted that Indiana precedent has been

> generalized to the proposition that an employee who has been fired for exercising a statutory right or for refusing to violate the law has a claim for wrongful discharge. Without embracing this general principle, we agree that to the extent Article I, [s]ection 9 is relevant to any claim for discharge, the claim is simply a common law claim for wrongful discharge.

*Cantrell,* 849 N.E.2d at 494. Based on this passage, we conclude that the *Cantrell* court did not establish a common law exception to the employment at will doctrine for wrongful discharge under Art. I, § 9. Rather, the court clarified that it was not "embracing this general principle." *Id.* The court's purpose was instead to indicate that Art. I, § 9 does not create a private right of action, which is not relevant to the issue at hand.

Instead, we conclude that broadening the public policy exception to the employment at will doctrine is not appropriate in Ogden's case. If we were to hold that a claimant could seek judicial review based on a right derived from the WBL through common law and, therefore, bypass the exhaustion of administrative remedies requirement of the WBL, it would make the exhaustion requirements of the WBL illusory. Accordingly, we determine that our review of Ogden's employment is governed by the employment at will doctrine.[4]

---

[4] We also recognize Ogden's argument that the trial court should have had subject matter jurisdiction over all of his claims regardless of the exhaustion of administrative remedies requirement since he also filed claims over which the trial court did have jurisdiction. In support of his argument, Ogden points to *Town*

18

Based on the foregoing, we conclude that (1) Ogden's memorandum was not protected speech under the Indiana Constitution; (2) Ogden was not entitled to due process protections under State personnel policy and EO 05-14; and (3) the trial court did not have subject matter jurisdiction over Ogden's claim that he was wrongfully terminated from his employment.

Affirmed.

DARDEN, J. and MATHIAS, J. concur

---

*Bd. of Orland v. Greenfield Mills, Inc.,* 663 N.E.2d 523, 525 (Ind. 1996), in which the supreme court stated that "[i]f all of the issues or claims are clearly matters for exclusive administrative or regulatory agency determination, the court is without subject matter jurisdiction and must dismiss the complaint. Conversely, where at least one of the issues or claims is within the jurisdiction of the trial court, the entire case falls within its jurisdiction." We will not address this argument in detail as we conclude that this court is without subject matter jurisdiction in any of Ogden's claims. The trial court granted summary judgment on Ogden's intentional infliction of emotional distress claim, and Ogden did not appeal that decision. In addition, Ogden's federal claims have already been addressed in federal court, and we have concluded that his remaining claims do not have subject matter jurisdiction in our Opinion here.