**FILED**

Dec 31 2015, 9:42 am

CLERK
of the supreme court,
court of appeals and
tax court



ATTORNEY FOR APPELLANT

Daniel L. Brown
Salem, Indiana

ATTORNEYS FOR APPELLEE

Douglas A. Hoffman
Jeremy M. Dilts
Carson Boxberger
Bloomington, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Daniel Harris,<br><br>*Appellant-Plaintiff,*<br><br>v.<br><br>Donald Brewer, Donald Crockett, and Thomas Lamb, Orange County Commissioners as governing body of the Orange County Highway Department,<br><br>*Appellees-Defendants.* | December 31, 2015<br><br>Court of Appeals Case No. 59A05-1501-CT-37<br><br>Appeal from the Orange Circuit Court<br><br>Trial Court Cause No. 59C01-1401-CT-4<br><br>The Honorable John T. Evans, Special Judge |

**Pyle, Judge.**

## Statement of the Case

[1]     Appellant/Plaintiff, Daniel Harris (Harris), appeals the trial court's grant of summary judgment in favor of Donald Brewer, Donald Crockett, and Thomas Lamb, Orange County Commissioners, as governing body of the Orange

County Highway Department ("Highway Department") (collectively, "Orange County"), on Harris's claims of wrongful termination and defamation. Harris was terminated from his employment with the Highway Department as a result of his alleged consumption of alcohol prior to operating a Highway Department vehicle. He subsequently filed wrongful termination and defamation claims, amongst others, against Orange County. Orange County filed a motion for summary judgment on the claims, and the trial court granted the motion.

[2] On appeal, Harris argues that the trial court erred in granting summary judgment on both claims. With respect to his wrongful termination claim, he asserts that the trial court should have ruled that he was not an at-will employee because it should have interpreted the Orange County Highway Department's Handbook of Personnel Policy ("the Handbook") as a valid unilateral employment contract stipulating that Harris's employment could only be terminated for just cause. Alternatively, Harris argues that even if the Handbook did not constitute a valid employment contract, an exception to Indiana's presumption of employment-at-will applied to him. With respect to his defamation claim, Harris asserts that the trial court erred in granting summary judgment because there were still genuine issues of material fact remaining for the factfinder to resolve.

[3] On cross-appeal, Orange County argues that the trial court erred in denying its motion to strike portions of the evidence Harris designated in his response to Orange County's motion for summary judgment.

We affirm the trial court's grant of summary judgment on Harris's wrongful termination claim because: (1) the Handbook did not constitute a valid unilateral contract; and (2) an exception to the employment-at-will doctrine did not apply to Harris. We also affirm the trial court's grant of summary judgment on Harris's defamation claim because Orange County had a qualified privilege to deliver Harris's termination letter and there were no genuine issues of material fact. As we also conclude that the evidence Orange County challenges in its cross-appeal is not dispositive, we need not address whether the trial court erred in denying Orange County's motion to strike evidence.

We affirm.

## Issues

### APPEAL

Whether the trial court erred in granting summary judgment in favor of Orange County on Harris's wrongful termination and defamation claims.

### CROSS-APPEAL

Whether the trial court erred when it denied Orange County's motion to strike portions of Harris's designated evidence.

## Facts

In 2013, Harris was employed by the Highway Department. Pursuant to his employment, he was assigned a Highway Department truck that he was allowed to take home after work. On August 7, 2013, an anonymous caller reported to the Indiana State Police that Harris was "driving a county highway

truck with a female passenger while intoxicated and was yelling out the window." (App. 68). Indiana State Trooper Michael Allen ("Trooper Allen") and another officer drove to Harris's residence to investigate. Trooper Allen later reported:

> Deputy Shipman and I drove up to his residence . . . and located a 2005 White Chevy truck with Municipal Plate 68133 sitting in the driveway. I felt the hood of the truck[,] and it was still hot. Mr. Harris exited his residence and asked what was going on. I explained to him that we had a complaint of him driving the County truck by the Sprint gas station while intoxicated and yelling out the window. Mr. Harris stated that he ha[d] not been to town but was in Mitchell earlier after work. He stated he drove the truck around 9:00 [p.m.] to the backside of his residence but denied being on the roadway. As I spoke to Mr. Harris I could smell [an] odor of an alcoholic beverage coming from his breath[,] and his eyes were very glossy. I did not observe any other signs of impairment. I asked him how much he had to drink[,] and he stated that he had been drinking since he got off work. I did give Mr. Harris a portable breath test[,] which tested positive for alcohol (.05)[.] I then told him I was going back to the Sprint gas station to pull the video of the time frame given to see if he was in fact there. He then stated that he forgot but he did go to the gas station to get cigarettes in the Company Vehicle. Mr. Harris then stated he had only [o]ne beer contrary to what he stated earlier. No charges were filed [] due to my observation that Mr. Harris was not intoxicated at the time of my contact with him. I did look inside the vehicle and there [were] no open containers[.]

(App. 68). The next day, Orange County sent Harris a letter stating that his employment with the Highway Department was terminated, effective

immediately, due to Harris's "admission" to the troopers that he had driven a county highway truck "after drinking alcohol." (App. 69).

[7] On January 9, 2014, Harris filed a complaint against Orange County seeking declaratory and injunctive relief. He claimed that Orange County had violated Indiana's open door law because it had not held a public meeting when it discussed terminating his employment. On March 21, 2014, Harris filed an amended complaint adding additional wrongful termination claims, as well as a defamation claim. With respect to the defamation claim, he argued that the allegations in his termination letter were defamatory and that Orange County had published the allegations because the letter was a public record. As a result of this asserted publication, Harris claimed that the allegations had damaged his reputation in the community and his ability to obtain further employment.

[8] On August 27, 2014, Orange County filed a motion for summary judgment. It argued that there were no genuine issues of material fact left to determine because: (1) Harris's open door claim had been untimely; (2) Harris had been an at-will employee at the time of his termination and, therefore, his employment had not been wrongfully terminated; and (3) it had not defamed Harris because the allegations in Harris's termination letter were true; he had been the only recipient of the letter; and Orange County had possessed a qualified privilege to write and deliver the letter, which was a defense to defamation.

[9] Harris filed a response to the motion for summary judgment, arguing that the trial court should deny the motion because there were still genuine issues of material fact left to decide, including whether: (1) Harris had operated the county truck while, or after, drinking; (2) the Handbook constituted a valid unilateral contract providing that Harris's employment could only be terminated for just cause; and (3) one of the exceptions to the employment-at-will doctrine applied to Harris if the Handbook did not constitute a contract. Harris tendered designated evidence with his response, including an affidavit containing his version of the events that had occurred on the night of August 7, 2013; a political endorsement titled "Political Endorsement—Indiana Republican State Committee" ("political endorsement"); an explanation of the political endorsement, which presumably accompanied it; and the Handbook.[1] (App. 71).

[10] In Harris's affidavit, he recounted his version of the events that had occurred on the night of August 7, 2013. He averred that he had returned home from work that night after running errands. He said that, for the next hour, he had worked on a plumbing problem at his house. Then, at 7:00 p.m., he had gone with his wife to a Sprint Station in Orleans. He said that when he pulled into the Sprint Station, a black SUV had pulled in front of him and had almost hit him. As a result, Harris had blown his horn and yelled at the SUV. Thereafter, according

---

[1] Harris's affidavit did not establish any context or foundation for the political endorsement or its explanation.

to Harris, his wife had purchased cigarettes at the store, and they had returned home around 8:00 p.m. Then, at 9:00 p.m., he had moved the county truck to the back of his residence. He averred that he had not at any point driven the county truck on the roadway after consuming alcoholic beverages. He also averred that when he returned to the Highway Department to take possession of his personal tools and toolbox, several employees commented to him that they had heard rumors and that he had "gotten the short end of the stick." (App. 47).

[11] The political endorsement that Harris designated was a form from the Indiana Republican State Committee documenting Harris's political party, the fact that he had voted in the previous primary election, and the county in which he had voted. It also contained Harris's contact information and was signed by the Republican State Committee's Precinct Commissioner, Vice Commissioner, County Chair, and Vice Chair. The form also explicitly provided that: "This is not an application for employment" and "[t]his completed card does not guarantee employment." (App. 71).

[12] The explanatory document that, presumably, accompanied Harris's political endorsement explained that:

> Political endorsement is required for most non-merit government employment and appointments. The elected office-holder who is responsible for filling such positions is dependent upon political party organization for campaign assistance. For this reason, the office-holder asks party officials to endorse all persons who are hired for non-merit jobs. Political endorsement will be valid for

either one calendar year or the length of time the applicant remains in continuous state employment.

If you are not now registered to vote, please do so in the county of your residence before requesting political endorsement. You can obtain the name and address of the required signatories by contacting your Republican County Chairman. Start the endorsement procedure by first contacting your precinct vice-committeeman and secure all endorsements 1 through 6. Return the completed card to the state agency or county chairman who furnished you the card. They will forward the card to State Headquarters for the State Chairman's endorsement.

(App. 72).

[13] On December 8, 2014, Orange County filed a reply, in which it included a motion to strike the political endorsement and a portion of Harris's affidavit. Orange County argued that Harris had not authenticated the political endorsement and that it was inadmissible hearsay. In addition, Orange County asserted that Harris's affidavit contained inadmissible hearsay statements such as the statements from Harris's co-workers regarding his termination and Harris's own statement that he did not consume any alcohol before driving the county truck. Orange County argued that Harris's statement was inadmissible because it contradicted his prior admission to Trooper Allen that he had consumed alcohol and because contradictory testimony by a non-movant may not be used to defeat a summary judgment motion where the only issue of fact raised by the affidavit is the credibility of the affiant.

On January 5, 2015, the trial court denied the motion to strike and entered a general grant of summary judgment in Orange County's favor on all three claims. Harris now appeals.

## Decision

On appeal, Harris challenges the trial court's grant of summary judgment to Orange County on his wrongful termination and defamation claims but not his open door claim. With respect to his wrongful termination claim, he argues that the Handbook was a valid unilateral contract such that Orange County could only terminate his employment for just cause. Alternatively, he asserts that even if, as Orange County claimed, the Handbook was not a contract and he was an at-will employee at the time of his termination, an exception to the employment-at-will doctrine applied to him. Finally, Harris argues that the trial court erred in granting summary judgment on his defamation claim because there were still genuine issues of material fact left for the factfinder to determine.

On cross-appeal, Orange County argues that the trial court erred when it denied Orange County's motion to strike a portion of Harris's designated evidence. Specifically, Orange County asserts that Harris's statement in his affidavit that "[w]hen I returned to the Orange County Highway Department to take possession of my personal tools and toolbox, several employees commented to me that they had heard rumors and that I had 'gotten the short end of the stick'" was inadmissible hearsay that the trial court should have struck. (App. 47).

When reviewing a trial court's grant of summary judgment, we apply the same standard as the trial court. *Carroll Creek Dev. Co., Inc. v. Town of Huntertown*, 9 N.E.3d 702, 708 (Ind. Ct. App. 2014). Summary judgment is appropriate only where the designated evidence shows "'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (citing Ind. Trial Rule 56(C)). The movant "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the movant fails to carry this burden. *Id.* However, if the movant succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* We view the facts in the light most favorable to the non-movant. *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). Where, as here, the defendant is the moving party, the defendant must demonstrate that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Bradley v. Hall*, 720 N.E.2d 747, 750 (Ind. Ct. App. 1999).

### 1. Wrongful Termination

On appeal, Harris argues that the trial court erred when it granted summary judgment on his wrongful termination claim. Harris's wrongful termination claim depends, in part, on whether he qualified as an at-will employee. Indiana follows the doctrine of employment-at-will, under which employment may be

terminated by either party at will, with or without a reason. *Ogden v. Robertson*, 962 N.E.2d 134, 145 (Ind. Ct. App. 2012), *trans. denied.* There is a strong presumption that employment in Indiana is at-will. *Id.* However, if the parties choose to include a clear job security provision in an employment contract, the presumption that the employment is at-will may be rebutted. *Wynkoop v. Town of Cedar Lake*, 970 N.E.2d 230, 235 (Ind. Ct. App. 2012), *trans. denied.* In such a case, the employer generally may not terminate the employment relationship before the end of the term except for just cause or by mutual agreement. *Orr*, 689 N.E.2d at 717. The wrongful discharge of a contract-bound employee gives rise to a cause of action for breach of contract. *Remington Freight Lines, Inc. v. Larkey*, 644 N.E.2d 931, 940 (Ind. Ct. App. 1994), *as clarified on denial of reh'g.* To prevail on a wrongful discharge claim, a contract-bound employee must prove that he or she had a contract of employment for a specific duration that was improperly terminated. *Ewing v. Bd. of Trustees of Pulaski Mem'l Hosp.*, 486 N.E.2d 1094, 1098 (Ind. Ct. App. 1985), *reh'g denied, trans. denied.*

[19] If an employment contract for an ascertainable term of employment does not exist, an exception to the employment-at-will doctrine may apply. Our supreme court has recognized three exceptions to the employment-at-will doctrine: (1) if an employee establishes that "adequate independent consideration" supports the employment contract; (2) if a clear statutory expression of a right or duty is contravened; and (3) if the doctrine of promissory estoppel applies. *Orr*, 689 N.E.2d at 718. When an exception to the employment-at-will doctrine applies, an employer may be liable for wrongful

discharge for discharging an employee without just cause. *See McGarrity v. Berlin Metals, Inc.*, 774 N.E.2d 71, 76 (Ind. Ct. App. 2002) (stating that an at-will employee "allegedly fired for refusing to commit an unlawful act for which he would be personally liable may bring a cause of action for wrongful discharge"); *Steele v. McDonald's Corp.*, 686 N.E.2d 137, 141 (Ind. Ct. App. 1997) ("[W]here an employee gives independent consideration for an employment contract . . . the employer may terminate the employee only for good cause. . . . [An] employee states a cause of action for wrongful or retaliatory discharge where he is discharged for exercising a statutorily conferred right or duty."), *reh'g denied*, *trans. denied*. However, unlike the wrongful discharge of a contract-bound employee, the wrongful discharge of an at-will employee gives rise to an action in tort. *Remington*, 644 N.E.2d at 940.

[20] Here, Harris did not have an employment contract for a definite or ascertainable term. However, he argues that the Handbook, disseminated by Orange County, contained job security promises from Orange County such that it constituted a unilateral employment contract requiring Orange County to have just cause to terminate his employment. Alternatively, he argues that one of the exceptions to the employment-at-will doctrine applied to him.

### A. The Handbook

[21] Harris's first argument, that the Handbook constituted a valid unilateral contract, is based on the Illinois Supreme Court's opinion in *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987). There, the Illinois Supreme Court held that an employee handbook may constitute a unilateral

employment contract binding an employer if three conditions are met: (1) the language of the employee handbook contains a promise clear enough that an employee would reasonably believe that an offer had been made; (2) the handbook is disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer; and (3) the employee accepts the offer by commencing or continuing work after learning of the terms of the handbook. *Duldulao*, 505 N.E.2d at 318. Although Indiana courts have addressed *Duldulao* in *Orr* and several subsequent cases, we have never adopted the *Duldulao* factors or otherwise held that an employee handbook may constitute a unilateral employment contract. *See, e.g.*, *Orr*, 689 N.E.2d at 721; *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 893 (Ind. Ct. App. 2007). Nevertheless, Harris argues that the Handbook here differs from the employee handbooks we have considered to date, such that we should re-consider *Duldulao* and find the Handbook to be a binding unilateral contract.

[22] The Handbook here contains phrases that implicate both employment for an ascertainable period of time and "at-will" employment, which are seemingly contradictory. Specifically, one of the Handbook's provisions stipulates that failure of any employee to adhere to the Highway Department's Code of Ethics will result in "immediate dismissal." (App. 60). In its "DISCIPLINE" section, the Handbook then provides that "[a]ll employees are 'at will'" and that "[a]n employee is subject to discipline for just cause." (App. 61). Finally, the "Termination" section of the Handbook contains two subsections—

"Mandatory Dismissal" and "Discretionary Dismissal." (App. 62). The
"Mandatory Dismissal" subsection provides that:

> An employee shall be *discharged immediately without notice* for
> misconduct of corporate policies or procedures, violations of
> state or federal laws and including, but not limited to the
> following:
>
> * * *
>
> 7. Use, possession, or consumption, of alcoholic
> beverages on the premises of the county . . .

(App. 62) (emphasis added). Then, the "Discretionary Dismissal" subsection

provides that:

> *All county employees*, other than those covered by merit board,
> serve *at the will* of the elected official for whom they work, and
> *nothing in this personnel policy is intended, nor shall it be construed, as
> altering this "at will" employment status.* Employees may be
> terminated at the pleasure and discretion of the elected official for
> whom they work, and *no reason for termination shall be required*,
> provided however, that no employee may be terminated for a
> legally impermissible reason.

(App. 62-63) (emphasis added). Harris argues that, because the Handbook says

that employees will be subject to discipline for "just cause," the Handbook

establishes that employment with the Highway Department is not at-will.

[23] In *Orr*, our supreme court declined to hold that an employee handbook may

constitute a unilateral contract or to adopt the *Duldulao* factors—although it did

not foreclose the possibility of doing either in a later case—based on the facts of

the case. *Orr*, 689 N.E.2d. at 721. The handbook at issue there did not contain

a statement that employees would be discharged only for just or good cause. *Id.* Instead, it expressly stated that: (1) while "in most cases, disciplinary action will begin with an oral warning . . . dismissal may occur immediately;" (2) the list of violations was "not intended to be all inclusive;" and (3) major violations could "result in immediate discharge without warning." *Id.* In addition, the front of the handbook contained a disclaimer stating that the handbook was not a contract and that its terms could be changed at any time. *Id.* Based on these factors, the *Orr* Court reasoned that the language of the handbook did not contain a promise of employment security clear enough that an employee would reasonably believe that an offer had been made, as required by the first step under *Duldulao*. *Id.* As a result, it held that it need not decide whether to adopt *Duldulao* because the handbook at issue would not qualify as an employment contract, even under *Duldulao*. *Id.*

[24] Thereafter, in *McCalment*, we addressed whether an employee handbook that had internally contradictory provisions constituted a valid unilateral contract. There, Eli Lilly & Co. ("Lilly") terminated McCalment's employment without following the grievance procedures outlined in its employee handbook. *McCalment*, 860 N.E.2d at 888. As a result, McCalment filed a breach of contract claim arguing that Lilly's employee handbook was a valid contract that bound Lilly to the termination procedures it had specified. *Id.* at 891. In support of this argument, McCalment noted that the handbook "devot[ed] [forty] pages to explaining [sic] how Lilly [would] treat its employees fairly based on merit" and only spent "two paragraphs . . . contradictorily and

ambiguously say[ing] [that] the Handbook '[was] not a contact of employment' and [that] either Lilly or the employee [could] end the relationship when they want[ed]." *Id.* at 893. On appeal of the trial court's denial of McCalment's breach of contract claim, we held that in light of "*Orr*'s reaffirming of the validity of the [at-will] doctrine and the disclaimer [in the handbook]," we could not say that the handbook contained a promise clear enough that an employee would reasonably believe that Lilly had made an offer of employment security. *Id.* In other words, even though Lilly's handbook focused on the measures it would take to treat its employees fairly, the contradictory provisions indicated that Lilly had not made a clear promise of employment security.

[25] After *McCalment*, we again considered the issue of whether an employee manual might constitute a valid contract in *Wynkoop*. The employee handbook at issue there contained a provision stating that, "In the event that disciplinary action must be taken against an employee, it will be for just cause." *Wynkoop*, 970 N.E.2d at 236. Wynkoop argued that this provision was a promise from his employer, the Town of Cedar Lake, that it would only terminate his employment for "just cause." *Id.* We disagreed, noting that the quoted language did not "explicitly assure disciplinary action 'only' for just cause" and that other portions of the handbook emphasized the at-will nature of the employment. *Id.* Based on our review of the employee handbook as a whole, including the provisions regarding at-will employment, we concluded that the Town of Cedar Lake had not made a clear promise that employees would be terminated only for just cause. *Id.*

In light of these precedents, we decline Harris's invitation to adopt *Duldulao* because, even if we were to adopt *Duldulao*, the Handbook would not constitute a valid unilateral contract as it does not contain a clear promise of secure employment. The overwhelming emphasis of the Handbook's provisions is that employment with the Highway Department is "at-will" and that dismissal may occur "immediately." (App. 61-62). Even though, as Harris notes, the Handbook also states that an employee is subject to discipline for "just case," we find it significant that, as in *Wynkoop*, the provision does not explicitly state that discipline will occur *only* for just cause. *See Wynkoop*, 970 N.E.2d at 236. In addition, Harris attempts to distinguish the Handbook from past precedent by noting that it does not contain a disclaimer, as the Handbook in *Orr* did, nor a definition of "at-will" employment. Regardless of those factors, however, the Handbook's stipulations that employment is "at-will" and may be terminated "immediately" indicate that it did not make a clear promise that Harris's employment would be terminated only for just cause.

### B. Exceptions to Employment-At-Will

Alternatively, Harris argues that, even if the Handbook did not constitute a valid unilateral contract, an exception to the presumption of at-will employment applied to him. As we stated above, our supreme court has recognized three exceptions to the employment-at-will doctrine: (1) if an employee establishes that "adequate independent consideration" supports the employment contract; (2) if a clear statutory expression of a right or duty is contravened; and (3) if the doctrine of promissory estoppel applies. *Orr*, 689

N.E.2d at 718.  Harris argues that the "independent consideration" and "promissory estoppel" exceptions apply to him.  Alternatively, he argues that his employment should be excluded from the employment-at-will doctrine as a matter of public policy.

[28]  Harris's first claim is that there was "independent consideration" supporting his employment because he provided his own tools to perform the work he did for the Highway Department and because he designated evidence that he had obtained a political endorsement for his employment.  We have held that if an employee provides independent consideration for an employment contract, then the employer may terminate that employee only for good cause without incurring liability for its actions.  *Swan v. TRW, Inc.*, 634 N.E.2d 794, 797 (Ind. Ct. App. 1994), *trans. denied.*  Indiana courts have identified different scenarios in which an employee's act or forbearance might provide adequate independent consideration.  *Wior v. Anchor Industries, Inc.*, 669 N.E.2d 172, 175 (Ind. 1996), *reh'g denied.*  For example, courts have held that giving up a competing business, conveying a valuable coal lease in exchange for employment, and releasing an employer from liability on a personal injury claim could all constitute adequate independent consideration.  *Id.* (citing *Ohio Table Pad Co. of Ind. v. Hogan*, 424 N.E.2d 144, 146 (Ind. Ct. App. 1981); *Mt. Pleasant Coal Co. v. Watts*, 151 N.E.7 (Ind. Ct. App. 1926); and *Toni v. Kingan & Co.,* 15 N.E.2d 80 (Ind. 1938)).  In addition, we have held that adequate independent consideration existed when an employee had a former job with assured permanency and accepted a new

position only after receiving assurances guaranteeing similar permanency. *Peru School Corp. v. Grant*, 969 N.E.2d 125, 132 (Ind. Ct. App. 2012), *trans. denied*.

[29]     In contrast, "'simply surrendering another job or moving to another location to accept a new position which the employee [has] sought, standing alone, does not constitute independent consideration.'" *Id.* (quoting *Orr*, 689 N.E.2d at 718). The reason for this rule is that:

> in moving and/or giving up her prior job, the employee is merely placing herself in a position to accept new employment. There is no independent detriment to the employee because she would have had to do the same things in order to accept the job on any basis, and there is no independent benefit bestowed upon the employer.

*Ohio Table Pad Co. of Ind.*, 424 N.E.2d at 146. In general, "[i]t is only where a different and substantial detriment is incurred" that "separate consideration has been found to exist." *Whiteco Industries, Inc. v. Kopani*, 514 N.E.2d 840, 844 (Ind. Ct. App. 1987), *trans. denied.* Further, we have declined to find independent consideration to support an employment contract requiring just cause for termination where there is no evidence that the consideration was offered in exchange for *permanent* employment. *See Swan*, 634 N.E.2d at 797 (finding that, even though employee had been influenced to accept a job based on retirement, insurance, and health benefits, there was no evidence that the employer offered permanent employment terminable only for just cause); *see Orem v. Ivy Tech State College*, 711 N.E.2d 864, 871 (Ind. Ct. App. 1999) (finding that employee bargained for specific position rather than for permanent

employment where the contract did not contain a tenure provision), *reh'g denied*, *trans. denied*.

[30] We conclude that neither Harris's use of his own tools in his employment nor his political endorsement were adequate independent consideration for his employment because he did not designate any evidence showing that he offered either in exchange for a promise of permanent employment. *See Swan*, 634 N.E.2d at 797; *Orem*, 711 N.E.2d at 871. To the contrary, the political endorsement explicitly states, "This completed card does not guarantee employment." (App. 71). Likewise, Harris did not provide any explanation for the reason he provided his own tools. Accordingly, we conclude that the trial court did not err in finding that he did not provide independent consideration for his employment. Thus, this exception to the employment-at-will doctrine does not apply to Harris.

[31] Alternatively, Harris argues that the promissory estoppel exception to the employment-at-will doctrine applied to his employment. Our supreme court has recognized that an employee may invoke the doctrine of promissory estoppel by "pleading the doctrine with particularity, demonstrating that the employer made a promise to the employee, the employee relied on the promise to his detriment, and the promise otherwise fits within the Restatement test for promissory estoppel." *Peru School Corp.*, 969 N.E.2d at 133-34 (citing *Baker v. Tremco, Inc.*, 917 N.E.2d 650, 654 (Ind. 2009)). As noted in *Peru School Corp.*, the Restatement provides:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement. The remedy granted for breach may be limited as justice requires.

*Id.* at 133 (citing Restatement (Second) of Contracts § 90(1) (1981)).

[32] Essentially, Harris's promissory estoppel argument appears to have four interrelated components: (1) the Handbook promised that employees would be discharged immediately without notice for misconduct only if they used, possessed, or consumed alcoholic beverages on the county's premises; (2) his truck did not fit within the definition of the county's premises; (3) the County, therefore, violated its promise; and (4) the County thus also violated the Handbook's promise that its contents would be "actively and consistently enforced." (App. 50).

[33] Harris's arguments lack merit because they are based on several misinterpretations. With respect to the first component of his argument, we find that the Handbook did not promise that employees would be discharged for misconduct *only* if they committed the misconduct on the premises of the county. Instead, the provision that Harris cites explicitly stated that employees would be discharged immediately without notice for misconduct "including, but not limited to" the list of misconduct included in the Handbook, which included misconduct occurring on the premises of the county. (App. 62). Therefore, it is irrelevant whether Harris's truck qualified as premises of the county as the Handbook did not limit the Highway Department's ability to

terminate its employees' employment by geographic location. Further, since the Department did not make any promises that it would only enforce misconduct on the premises of the county, Orange County did not break any such promises by terminating Harris for his conduct involving his truck. In addition, Harris's termination was not evidence that the Department had failed to consistently enforce the Handbook.

[34] Finally, Harris argues that we should find an exception to the employment-at-will doctrine based on public policy. He notes that Judge Robb of this Court has written separate opinions in two cases arguing that provisions of employer handbooks, as well as employers' promises "should mean something." (Harris's Br. 15) (citing *Wynkoop*, 970 N.E.2d at 238 (Robb., J., concurring opinion)). He argues that the Handbook's promises will only "mean something" if we interpret it as a valid contract. In support of this argument, he also contends that "[w]hen employees are satisfied and secure in their employment, the employer is more assured that the employee will be productive. Employees cannot be secure in their employment knowing that employee policies regarding discipline may not be followed." (Harris's Br. 15).

[35] We decline to address this argument because it does not fall within one of the exceptions that Indiana courts have recognized for the employment-at-will doctrine, and we do not wish to create a new exception here. Indiana appellate court have "consistently refused to create a public policy exception to the employment[-]at[-]will doctrine in the absence of a statute defining public policy." *Hamblin v. Danners, Inc.*, 478 N.E.2d 926, 929 (Ind. Ct. App. 1985); *see*

*also Meyers v. Meyers*, 861 N.E.2d 704, 707 (Ind. 2007) ("In *Morgan Drive Away*, we emphasize that the 'employment at will doctrine has steadfastly been recognized and enforced as the public policy of this state' and that '[r]evision or rejection of the doctrine is better left to the legislature.'") (quoting *Morgan Drive Away, Inc. v. Brant*, 489 N.E.2d 933, 934 (Ind. 1986)). Moreover, as we have already concluded, the Handbook did not contain any clear promises of employment. Therefore, there are not any promises for us to enforce under the guise of public policy.

## 2. Defamation

Finally, Harris argues that the trial court erred when it granted Orange County's motion for summary judgment on his defamation claim. A defamatory communication is "one that tends to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Baker v. Tremco, Inc.*, 917 N.E.2d 650, 657 (Ind. 2009). To establish defamation, a plaintiff must prove the following elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Shine v. Loomis*, 836 N.E.2d 952, 956 (Ind. Ct. App. 2005), *reh'g denied*, *trans. denied.* A defendant in a defamation case is entitled to summary judgment if he demonstrates that the undisputed material facts negate at least one element of the plaintiff's claim, *id.*, or if he demonstrates that he has a defense to defamation. *See, e.g.*, *Northern Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 301 (Ind. Ct. App. 1999) (noting that truth is an affirmative defense to defamation), *reh'g denied*, *trans. denied.*

[37] Here, Orange County argued on summary judgment that the undisputed facts demonstrated that it did not have any malice. In addition, it asserted that it had two defenses to Harris's defamation claim—(1) that its allegations in Harris's termination letter regarding Harris's drinking were true; and (2) that it had a qualified privilege to deliver the termination letter. The trial court entered a general grant of summary judgment, so the record is unclear as to which basis it granted summary judgment. However, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment and may affirm upon any theory supported by the designated materials. *Old Romney Development Co. v. Tippecanoe Cnty.*, 817 N.E.2d 1282, 1285 (Ind. Ct. App. 2004).

[38] Qualified privilege exists as a defense to defamation in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs. *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992). This defense applies to communications "made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Id.* Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law. *Id.* Intracompany communications regarding the fitness of an employee are protected by the qualified privilege. *Id.*

[39] Because Orange County's statements in Harris's termination letter were intracompany communications that concerned his fitness to work, we conclude

that Orange County's deliverance of the letter was protected by a qualified privilege. *See id.* Nevertheless, a statement otherwise protected by the doctrine of qualified privilege may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill-will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth. *Id.* Once the statement is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused. *Id.*

[40] Here, Harris did not meet his burden of showing that Orange County had abused its qualified privilege. He did not designate any evidence that the letter was motivated by ill-will, that it was published excessively, or that Orange County did not believe in the truth of its allegations. Instead, the letter was delivered solely to Harris. He asserts that his designated evidence that his co-workers told him that they had heard he had "gotten the short end of the stick" was evidence that the allegations against him were widely published. (App. 47). However, we find that, even if we consider his co-worker's statements, they merely proved that his co-workers knew his employment had been terminated, not that the reason for his termination was published to them. Accordingly, since Orange County had a qualified privilege to deliver Harris's termination letter, and there was no evidence that it abused that privilege, we

conclude that the trial court did not err in granting summary judgment in favor of Orange County on Harris's defamation claim.[2]

Affirmed.

Crone, J., and Brown, J., concur.

---

[1] [2] In its cross-appeal, Orange County argues that the trial court erred when it denied Orange County's motion to strike the portions of Harris's affidavit where he discussed the statements of his co-workers and when it denied Orange County's motion to strike Harris's designated political endorsement. Because we have found that the evidence Orange County challenges is not dispositive, and because we may find in favor of Orange County without considering its cross-appeal, we will not address the issues it raises in its cross-appeal any further.