

**FILED**

Mar 19 2019, 8:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEYS FOR APPELLANTS | ATTORNEY FOR APPELLEE |
|---|---|
| Michael D. Sears | D. Eric Neff |
| Jacquelyn S. Pillar | Crown Point, Indiana |
| Crown Point, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Community Foundation of Northwest Indiana, Inc., St. Mary Medical Center, Inc., and Rebecca Iwanus, | March 19, 2019 |
| *Appellants-Defendants,* | Court of Appeals Case No. 18A-PL-1458 |
| v. | Appeal from the Lake Superior Court |
| Elizabeth A. Miranda, | The Honorable Calvin D. Hawkins, Judge. |
| *Appellee-Plaintiff.* | Trial Court Cause No. 45D02-1511-PL-83 |

**Tavitas, Judge.**

## Case Summary

[1]     Community Foundation of Northwest Indiana, Inc. ("Community"), St. Mary

Medical Center, Inc. ("St. Mary's"), and Rebecca Iwanus (collectively,

"Defendants") appeal the trial court's denial of their motion for summary

judgment in proceedings brought by Elizabeth Miranda. We reverse and remand.

## Issue

Defendants raise one issue, which we restate as whether the trial court properly denied Defendants' motion for summary judgment.

## Facts

Miranda began working at St. Mary's in 2014 as a nurse on the oncology floor. Miranda was unemployed prior to beginning her job at St. Mary's. After approximately six months of employment at St. Mary's, Miranda requested and was granted a transfer within St. Mary's to a new position as a nurse liaison in the emergency department. According to Defendants, the nurse liaison's role was:

> At the time of "arriving" a patient [which occurs when a patient arrives at the emergency department and registration employees input the patient into the hospital's system], if a nurse liaison was present, her job was to instruct the registration employee as to the patient's chief complaint after discussion with the patient. If the nurse liaison was not present, the registration employee would input the chief complaint based on the patient's description, and the liaison would later amend the complaint, as necessary.

Appellants' App. Vol. II p. 41 (internal citations omitted). Miranda claims, because the position was relatively new to St. Mary's, the assigned duties of the nurse liaison evolved as the position became more developed. "Arriving" a patient essentially means noting their arrival time to the emergency department.

*See* Appellant's App. Vol. II p. 104 (Iwanus states that, "When a patient came up to the desk, we were to take their ID, arrive the patient"); *see also* Appellant's App. Vol. III p. 8 (Miranda explains that her role as a nurse liaison changed, and "[d]uties were added. At first we were supposed to be strictly at the registration, or the desk, to arrive the patient and get the chief complaint"). Arriving a patient is important because certain procedures would need to be followed for certain patients within a pre-determined time period depending on the patient's symptoms. For example, patients who came in complaining of chest pain would need to be given an EKG within a certain time period after the patient's arrival. Thus, noting a patient's arrival time is important for purposes of rendering adequate and timely care.

[4] Greg Sampson is the Director of Emergency Services at St. Mary's and was Miranda's direct supervisor. Iwanus was the supervisor of the registration employees in the emergency department, and she supervised the registration employees with whom Miranda, as nurse liaison, would work in the emergency department.[1] In April 2015 (the "April meeting"), Sampson notified Miranda that he received an email in March, complaining that Miranda was asking the registration employees to delay recording the time of "arriving" patients, which was "un[]ethical." Appellants' App. Vol. III p. 189.

---

[1] The registration employees are not registered nurses.

Miranda claims that Sampson showed her the email complaint in the April meeting authored by Iwanus. Iwanus, however, denies ever complaining about Miranda. Until this point, Miranda stated that she and Iwanus never had any issues with one another. Miranda admitted that she recalled asking a registration employee to delay an "arriving" patient time in March 2015. At the April meeting, Sampson instructed Miranda not to ask registration employees to delay "arriving" patient times again.

In July 2015, Miranda received her positive review for her performance during the time period from March 10, 2014, until March 10, 2015, which was prior to the date of the complaint Sampson received regarding Miranda's request to delay "arriving" patient times. Later that month, on July 23, 2015 (the "July meeting"), Miranda was summoned to a meeting with Sampson and a human resources representative. Sampson presented Miranda with a notice of corrective action for again asking employees to delay "arriving" patients. Sampson received complaints that Miranda again made the request to registration employees on two separate occasions on July 20, 2015. Miranda denies that she asked the registration employees to delay "arriving" patient times again. Miranda informed Sampson that she would be submitting a rebuttal to challenge the accusations made against her.

After the July meeting, Miranda was suspended and escorted out. Immediately after Miranda was escorted out, she contacted Lori Alicea, one of the registration employees, and informed Alicea that Miranda had been suspended, with the possibility of termination, due to allegations that Miranda was

delaying patient treatment. According to Miranda, Alicea "became emotional" and apologized because Alicea had raised the issue in July to supervisors, because she was looking for direction on the proper course of action, and her intent was not to get Miranda fired. Appellant's App. Vol. II p. 202. Miranda also contacted Gwen Perfetti, another nurse liaison and also told Perfetti that she was suspended with a possibility of termination. Miranda claims she received several phone calls from coworkers once they became aware of her suspension.

[8] After Miranda's suspension, Miranda submitted a rebuttal on July 27, 2015, and attempted to begin the problem solving procedure outlined in the employee handbook. Sampson terminated Miranda on July 29. After her termination, Miranda's nursing license was due for renewal, and Miranda was required to list her termination on her renewal application. Miranda was required to participate in a hearing before the Board of Nursing ("the Board") to renew her license. While Miranda's hearing was pending, her license was put on temporary status, but ultimately, Miranda's license was renewed by the Board.

[9] On November 17, 2015, Miranda filed her "Complaint for Damages and Injunctive Relief" (the "Complaint") against Defendants. Miranda's Complaint alleges Count I, "Breach of Contract/Wrongful Termination"; Count II, "Defamation, Libel & Slander Against Community and/or St. Mary's"; Count III, "Defamation, Libel & Slander Against Iwanus"; Count IV, "Negligence Against Iwanus, Community, and/or St Mary's"; Count V, "Promissory Estoppel"; and Count VI, "Tortious Interference with Contractual

Relationship/Business Relations." *Id.* at 14-22. We address the basis for each claim further below.

[10] Miranda's complaint also sought injunctive relief, asking the trial court to issue an injunction (1) prohibiting Defendants from sharing any information regarding Miranda's employment with Community and St. Mary's; (2) requiring St. Mary's and Community to remove all "negative and false notations" in Miranda's employment records; (3) prohibiting St. Mary's and Community from refusing Miranda entrance to the premises where Miranda's "current employment requires her attendance"; (4) requiring St. Mary's and Community to turn over any and all employment records related to Miranda; (5) requiring St. Mary's and Community to "remove any and all negative notations, comments, and/or findings . . . . associated with [Miranda's] nursing license"; and (6) requiring St. Mary's and Community to immediately stop all communications with the Board related to Miranda's nursing license until the resolution of Miranda's lawsuit. *Id.* at 23.

[11] Defendants filed a motion for summary judgment on January 31, 2018. After a hearing on May 16, 2018, the trial court concluded that it would take the motion under advisement.[2]

---

[2] At the summary judgment hearing, the trial court stated:

> What I will do, and tell you, I will – and what I normally do for a motion for summary judgment proceedings is that I will certify whatever ruling I have, because there are a lot of legal arguments in this one. And it would be almost a waste of time – well, I'm

The trial court ultimately entered an order on May 23, 2018, denying Defendants' motion for summary judgment and certifying the order for interlocutory appeal sua sponte.

## Analysis

[12] Defendants appeal the trial court's denial of their motion for summary judgment on all counts of Miranda's complaint. Summary judgment is appropriate only when the moving party shows there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Erie Indem. Co. for Subscribers at Erie Ins. Exch. v. Estate of Harris by Harris*, 99 N.E.3d 625, 629 (Ind. 2018), *reh'g denied*; *see also* Ind. Trial Rule 56(C). Once that showing is made, the burden shifts to the nonmoving party to designate appropriate evidence to demonstrate the actual existence of a genuine issue of

---

perceiving it might be a waste of time that just a plain ruling, and you go through a trial, and it goes up on appeal, wasted all of that time, . . . But I will take it under advisement. And, of course, in summary judgment, we always start with the more favorable arguments initially throughout going toward the nonmovant. That's basic case law. . . . But whatever it is in terms of the ruling, I will certify it. And generally, there are a few exceptions on one hand – I have been here on the bench now 11 years. I don't think there have been more than five cases that have not been taken up by the Court of Appeals where I certified it, the losing party takes it up on interlocutory appeal, and the Court of Appeals hears it, because then you'd have some work to do. And I give them work.

\* \* \* \* \*

Because I allow the Court of Appeals to deal with that. And I haven't been censured yet, but there's always a first time. You all can say he did "X" and he should have done "Y" and "Z."

Summary Judgment Hearing Tr. pp. 17-18.

material fact. *Schoettmer v. Wright*, 992 N.E.2d 702, 705-06 (Ind. 2013). When ruling on the motion, the trial court construes all evidence and resolves all doubts in favor of the non-moving party. *Id.* at 706. We review the trial court's ruling on a motion for summary judgment de novo, and we take "care to ensure that no party is denied his day in court." *Id.* "We limit our review to the materials designated at the trial level." *Gunderson v. State, Indiana Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018).

### A. Breach of Contract, Promissory Estoppel, Wrongful Termination

[13] Defendants argue that the trial court erred by denying their motion for summary judgment on Miranda's breach of contract claim. Miranda's basis for her breach of contract claim is that she signed an employment offer letter and on-boarding schedule (the "offer letter") and an employee handbook (the "handbook"), which applies to all St. Mary's employees, when she began her employment with St. Mary's in 2014. Miranda contends that the offer letter and the handbook constitute her employment contract. In response, Defendants claim that Miranda was an at-will employee, who was terminated due to performance issues. Importantly, Defendants note that the handbook squarely states it is not a contract of employment.

### i. The Documents

[14] First, we analyze the contents of the documents Miranda contends are contracts. The offer letter includes directions at the top, which state:

Please review the following form and provide your electronic signature at the far bottom to indicate your acceptance of the terms of employment. If you do not accept these terms, have any changes or if you have any questions, please contact your HR representative promptly.

Appellants' App. Vol. II p. 93. The offer letter contains personal information about Miranda, including her name, address, phone number, date of birth; date of hire; job title; manager; starting rate; shift; pay group; benefit program; job code; department; and hours worked per pay period. The offer letter also states:

This offer of employment and your continued employment with [sic] is contingent upon your successful completion of an employee health and background screening. Please indicate you accept this agreement by providing your electronic signature below.

*Id.* Miranda signed and dated the offer letter on February 25, 2014. Once Miranda transferred to the emergency department, she received an email titled, "Employee Transfer Information," which included most of the same information that was included in the offer letter. Notably, there is a start date listed, but no term of employment on either document.

[15] The handbook, a separate document, states that it "is not a contract guaranteeing employment for any specific duration. Although we hope that your employment relationship with us will be long-term, either you or Management may terminate this relationship at any time, for any reason, with or without cause or notice." Appellants' App. Vol. III p. 53. The handbook states that employment at St. Mary's is "at will." *Id.* at 63. The handbook also

states that the policies contained in the handbook are "subject to change at the sole discretion of Management." *Id.* at 53. Finally, with regard to Miranda's specific allegations in this lawsuit, the handbook advises that "problem solving is not available to the following corrective action status: suspension which could result in termination." Appellants' App. Vol. II p. 96.

## ii. Types of Employment

[16] In *Orr v. Westminster Village North, Inc.,* our Supreme Court set forth the distinctions in the type of employment in Indiana. 689 N.E.2d 712, 717 (Ind. 1997).

> Historically, Indiana has recognized two basic forms of employment: (1) employment for a definite or ascertainable term; and (2) employment at-will. If there is an employment contract for a definite term, and the employer has not reserved the right to terminate the employment before the conclusion of the contract, the employer generally may not terminate the employment relationship before the end of the specified term except for cause or by mutual agreement. If there is no definite or ascertainable term of employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party. *Wior v. Anchor Industries, Inc.,* 669 N.E.2d [172,] 175 (Ind. 1996); *Speckman v. Indianapolis,* 540 N.E.2d 1189, 1192 (Ind. 1989) . . . .

> The employment-at-will doctrine is a rule of contract construction, not a rule imposing substantive limitations on the parties' freedom to contract. *Streckfus v. Gardenside Terrace Co-Op., Inc.,* 504 N.E.2d 273, 275 (Ind. 1987). If the parties choose to include a clear job security provision in an employment contract, the presumption that the employment is at-will may be rebutted. *See Speckman,* 540 N.E.2d at 1192; *Streckfus,* 504 N.E.2d at 275.

Nevertheless, in Indiana, the presumption of at-will employment is strong, and this Court is disinclined to adopt broad and ill-defined exceptions to the employment-at-will doctrine. []

*Orr,* 689 N.E.2d at 717-18.

[17] Even though the presumption of at-will employment in Indiana is strong, our Supreme Court has acknowledged certain exceptions to the at-will employment presumption.

> First, if an employee establishes that "adequate independent consideration" supports the employment contract, the Court generally will conclude that the parties intended to establish a relationship in which the employer may terminate the employee only for good cause. Generally, simply surrendering another job or moving to another location to accept a new position which the employee sought, standing alone, does not constitute adequate independent consideration.
>
> * * * * *
>
> Second, we have recognized a public policy exception to the employment-at-will doctrine if a clear statutory expression of a right or duty is contravened. For example, we have invoked the public policy exception when an employee was discharged for filing a workmen's compensation claim, or when an employee was discharged for refusing to commit an illegal act[.]
>
> * * * * *
>
> Third, this Court has recognized that, in certain instances, an employee may invoke the doctrine of promissory estoppel. To do so effectively, the employee must plead or assert the doctrine

with particularity. The employee must assert and demonstrate that the employer made a promise to the employee; that the employee relied on the promise to his detriment; and that the promise otherwise fits within the Restatement test for promissory estoppel.

*Id.* at 718 (citations omitted).

The *Orr* court also stated that it was going to "decline plaintiffs' invitation" to use that case to determine whether an employee handbook "can ever constitute a unilateral contract serving to modify the otherwise at-will employment relationship." *Id.* at 720. Still, the *Orr* court concluded:

> Even if we were to conclude that an employee handbook, under some circumstances, can constitute a valid unilateral contract in the absence of adequate independent consideration—and we do not do so today—[the employer's] Handbook could not constitute such a unilateral contract and, in fact, cannot meet the requirements set forth in *Duldulao v. Saint Mary of Nazareth Hosp. Center,* 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987), upon which plaintiffs primarily rely while urging the Court to create a handbook exception to the employment-at-will doctrine.

*Id.* The *Duldulao* rule states:

> [A]n employee handbook may constitute a unilateral contract and bind the employer if the following three criteria are met: (1) the language of the employee handbook must contain a promise clear enough that an employee would reasonably believe that an offer had been made; (2) the employee handbook must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be

an offer; and (3) the employee must accept the offer by commencing or continuing work after learning of the terms of the employee handbook.

*Id.* In other words, our Supreme Court appeared to consider, without explicitly adopting, the *Duldulao* rule. Furthermore, because the plaintiffs in the *Orr* court focused on the issue regarding the contract, the court there did not focus on whether the plaintiffs defeated the presumption of at-will employment otherwise. *See id.* at 717 ("The sole question in this case is whether the Handbook served to convert plaintiffs' otherwise at-will employment relationship with Westminster into an employment relationship that required Westminster to terminate them only for good cause"). Here, we construe Miranda's argument to be both that she had a contract, pursuant to the *Orr* court's analysis in *Duldulao,* and that, even if she did not have a contract, she has defeated the presumption of at-will employment. Accordingly, we address both arguments.

### iii. *Miranda did not have a contract with St. Mary's or Community*

[19] We are again persuaded by the *Orr* court in our analysis of this issue. In concluding that the handbook in *Orr* did not meet the *Duldulao* requirements, our Supreme Court stated:

> Here, we need go no further than the first step under *Duldulao.* The Handbook certainly cannot be said to contain a "clear promise" which plaintiffs could reasonably believe constitutes an "offer." Not only is a statement that employees will only be discharged for just or good cause absent from the Handbook, but also the Handbook expressly states that while "in most cases,

disciplinary action will begin with an oral warning . . . . if warranted . . . dismissal may occur immediately." (R. at 33.) The Handbook also states that the list of violations "is not intended to be all inclusive," (R. at 83) and emphasizes that major violations in particular "can result in immediate discharge without warning," (R. at 82). Thus, there is no clear promise to follow a progressive disciplinary approach, and, in fact, there are clear statements which provide that Westminster, in appropriate circumstances, may discharge employees without warning. Under such circumstances, Illinois courts interpreting *Duldulao* have concluded that, as a matter of law, the employee handbook does not create enforceable contract rights because the handbook has prescribed no "specific procedures" by "positive and mandatory language." *St. Peters v. Shell Oil Co.,* 77 F.3d 184, 187 (7th Cir. 1996); *Lampe v. Swan Corp.,* 212 Ill.App.3d 414, 156 Ill.Dec. 658, 659, 571 N.E.2d 245, 246 (1991).

If this were not enough, the Handbook also contains a disclaimer, which is placed towards the front of the Handbook and which clearly states that the Handbook is not a contract and that its terms can be changed at any time. A similar disclaimer is included in the Personnel Handbook Statement which accompanied, and was referenced in, the Handbook and which Westminster required plaintiffs to sign. Again, even under the *Duldulao* rule, an employee handbook bearing or accompanied by such disclaimers, particularly when the employee signs one of the disclaimers, generally, as a matter of law, does not create a unilateral contract.

* * * * *

The Handbook's vague and general statements about categories of employees, annual performance reviews, and job security, when weighed against the clear and specific language giving Westminster broad discretion in disciplinary matters and the prominent disclaimers, are simply not enough to create an issue

of material fact as to whether the Handbook constituted a valid offer under a unilateral contract analysis. *See Lee v. Canuteson,* 214 Ill.App.3d 137, 157 Ill.Dec. 900, 573 N.E.2d 318 (1991). As a matter of law, then, such a Handbook could not constitute a valid unilateral contract even if we were to hold that there were no requirement that such a contract be supported by adequate independent consideration.

*Id.* at 721-22.

[20] While the handbook and offer letter here are not exactly the same as the one at issue in *Orr,* the similarities clearly demonstrate that these documents cannot be construed to be a contract under *Duldulao.* First, the offer letter appears to be nothing more than an administrative document that gives Miranda information related to her employment. Second, the handbook itself squarely states that it is not a contract. The handbook also states that all employees are at-will and that the contents of the handbook should not be construed as a contract. The mere fact that the handbook sets out certain employee policies does not convert the handbook into an employment contract. *See Wynkoop v. Town of Cedar Lake,* 970 N.E.2d 230, 236 (Ind. Ct. App. 2012) ("Following *Orr,* this Court has declined to construe personnel policies as converting an individual's employment from an at-will relationship" to a contract.), *trans. denied; see also Harris v. Brewer,* 49 N.E.3d 632, 642 (Ind. Ct. App. 2015) (finding that the handbook "would not constitute a valid unilateral contract as it does not contain a clear promise of secure employment"), *trans denied.* Furthermore, the handbook states that St. Mary's has the authority to change the contents of the handbook on its own.

Because we find that Miranda does not have a contract for employment, we also reject her arguments that certain procedures in the handbooks were not followed, constituting a breach of contract. For completeness, however, we respond to Miranda's argument that a thorough investigation of the allegations against her was not completed. Specifically, Miranda contends that a "thorough investigation" was not conducted because "no one questioned any of the character witnesses supplied to the Appellants by Miranda[.]" Appellee's Br. p. 15.

While we generally agree with Miranda's contention that policies in the handbook should mean something, we cannot say the designated evidence demonstrates that a thorough investigation was not completed. In fact, there are several emails and documents related to the allegations against Miranda. The corrective action indicates there was "further review[.]" Appellants' App. Vol. II p. 110. Miranda's contention that Defendants did not speak with her "character witnesses" does not create a genuine issue of material fact as to whether Miranda has a contract for employment. *See* Appellee's Br. p. 15.

We reject the idea that Miranda had a contract for employment, and accordingly, we will evaluate whether Miranda has otherwise overcome the presumption of at-will employment.

### iv. Miranda is an at-will employee

As stated above, under *Orr,* there are three exceptions to overcome the presumption of at-will employment. The exceptions are: (1) adequate

independent consideration; (2) public policy; and (3) promissory estoppel. In examining the three prongs in *Orr* to determine whether Miranda has overcome the presumption of at-will employment, it is clear she has not. It is also clear that Defendants have designated evidence which points to Miranda's at-will employment status.

### *a. Adequate Independent Consideration Exception*

[25] First, the designated evidence demonstrates there was no adequate independent consideration. Not only does the designated evidence show that Miranda did not move or relocate to begin her job at St. Mary's, Miranda was not employed prior to her job at St. Mary's. Accordingly, it cannot be reasonably argued that Miranda received some individual consideration for commencing employment. Miranda argues that consideration does exist, but we are unclear what the consideration may be because the designated evidence does not demonstrate any consideration.[3] *See* Appellee's Br. p. 14. This is not considered adequate for the purpose of finding Miranda's employment at St. Mary's subject to this

---

[3] Appellee's full argument states:

> Applying *Wynkoop* to the case at bar reveals that Miranda in her designated materials has two documents to establish a contract. The first is the Agreement of Employment Offer . . . wherein it sets forth Miranda's position, her rate of pay, her shift; and required her signature to accept the offer of employment agreement. All the elements of a contract exist offer [sic], acceptance and consideration.

Appellee's Br. p. 14. To the extent Miranda argues that St. Mary's payment to Miranda for her services as an employee is the consideration, we believe this is insufficient for the adequate independent consideration analysis. To conclude otherwise would mean virtually every employment offer letter stating an employee's rate of pay and requesting an employee's signature becomes an employment contract.

first exception to at-will employment. The adequate independent consideration exception is inapplicable here.

### b. Public Policy Exception

[26] Furthermore, Miranda's employment was not terminated for a reason that would trigger the public policy exception. Miranda was terminated for continuing to request the registration clerk to delay the time for "arriving" patients, which Miranda had previously admitted to, and she was warned to refrain from such practice. Regardless of whether this conduct was "unethical," as Miranda contends it was not, Miranda was instructed not to request delaying the recording time of "arriving" patients out of concern for patients, and she continued to make these requests to the registration clerks. The public policy exception is inapplicable here.

### c. Promissory Estoppel Exception

[27] Finally, as to the third exception under the *Orr* analysis, there is no designated evidence that would entitle Miranda to relief under a theory of promissory estoppel. To prevail under a theory of promissory estoppel, Miranda "must assert and demonstrate that the employer made a promise to the employee; that the employee relied on that promise to [her] detriment; and that the promise otherwise fits within the Restatement test for promissory estoppel." *Orr*, 689 N.E.2d at 718.

[28] Miranda asserts that, in addition to the discipline procedures as set forth in the handbook, Miranda's "glowing review" that she received shortly before her

suspension demonstrates that she met the standards of Defendants' employment. Appellee's Br. p. 17. With regard to the review, it is not the case that a positive review of Miranda results in a shield of continued employment. While Miranda may not have known about the review until after she was accused of asking registration employees to delay "arriving" patients, the review occurred before the complaints were lodged against Miranda.

[29] Furthermore, Miranda's only alleged detriment was loss of employment. If loss of employment was sufficient for promissory estoppel, every terminated employee would have a claim for promissory estoppel. *See Jarboe v. Landmark Community Newspapers of Indiana, Inc.,* 644 N.E.2d 118, 122 (Ind. 1994) ("The doctrine of promissory estoppel may be available to an at-will employee, but the remedy is limited to damages actually resulting from the detrimental reliance and will not include the benefit of altering the employment status from an at-will relationship to a permanent one. . . ."); *see also Uhlman v. Panares,* 908 N.E.2d 650, 655 (Ind. Ct. App. 2009) (concluding that, despite Uhlman's argument that she was a contract employee through the company's personnel policies, Uhlman was an at-will employee and "under Uhlman's reasoning, no employee covered by the Personnel Policies would be an at-will employee").

[30] Based on Miranda's alleged reliance, Miranda contends she needed assistance to pay regular expenses after her termination. Miranda, however, does not have a valid claim for future wages under the doctrine of promissory estoppel. Specifically, regarding promissory estoppel:

> [T]he line Indiana draws is between expectation damages and
> reliance damages.  In future wages, the employee has only an
> expectation of income, the recovery of which promissory
> estoppel will not support in an at-will employment setting.  In
> wages forgone in order to prepare to move, as in moving
> expenses themselves, the employee gave up a presently
> determinate sum for the purpose of relocating.  Both moving
> expenses and forgone wages were the hopeful employee's costs of
> positioning himself for his new job; moving expenses happen to
> be out-of-pocket losses, while forgone wages are opportunity
> costs.  Both are reliance costs, not expectancy damages.

*Jarboe,* 644 N.E.2d at 122 (quoting *D&G Stout, Inc. v. Bacardi Imports, Inc.,* 923 F.2d 566, 569 (7th Cir. 1991)).  In *Jarboe,* our Supreme Court expressly rejected the requested damages "[t]o the extent that the plaintiff's request for estoppel seeks to compel the defendants to resume their employment of the plaintiff, or seeks damages in the form of lost wages following his discharge," because these damages constituted expectation damages.  *Id.*  The same is the case here.  Miranda does not contend she had specific out-of-pocket losses from moving or even from giving up more reliable employment for her job at St. Mary's.  Instead, Miranda merely seeks damages for future employment.  These "damages" do not constitute detrimental reliance in the context of a promissory estoppel claim.  The promissory estoppel exception is inapplicable here.

### *v.    Wrongful Termination*

Because we find that the handbook and the offer letter do not constitute a contract of employment and the at-will employment exceptions do not apply, Defendants are also entitled to summary judgment on Miranda's complaint for

wrongful termination. *See Harris,* 49 N.E.3d at 636 (affirming denial of Harris'
wrongful termination claim on summary judgment because "the Handbook did
not constitute a valid unilateral contract; and [] an exception to the
employment-at-will doctrine did not apply to Harris"), *trans. denied.*

[32] Accordingly, Defendants established that there were no genuine issues of
material fact and that they were entitled to judgment as a matter of law on the
issues of breach of contract, promissory estoppel, and wrongful termination.
The trial court erred in failing to grant summary judgment in favor of
Defendants on these counts.

## *B. Defamation, Libel, and Slander*

[33] Defendants also argue that it was error for the trial court to deny their motion
for summary judgment on Miranda's claims for defamation, libel, and slander
against Defendants. Miranda's count for defamation alleges:

\* \* \* \* \*

36. That Defendant Iwanus spoke, published, disseminated, or
otherwise communicated throughout the workforce, and/or the
Nursing Community and/or the public that Plaintiff Miranda
was "unethical."

37. That Defendant Iwanus spoke, published, disseminated, or
otherwise communicated throughout the workforce, and/or the
Nursing Community and/or the public that Plaintiff Miranda
was incompetent, as set forth in the Notice of Corrective Action.

38. That Defendant Iwanus spoke, published, disseminated, or otherwise communicated throughout the workforce, and/or the Nursing Community and/or the public that Plaintiff Miranda was terminated from Community for receiving multiple write-ups, and/or for reasons of continual incompetency, and/or simply made up outlandish reasons as to why Plaintiff Miranda was terminated from Community, all of which were, and remain utterly devoid of merit, untrue, lacking in factual basis, and made by Defendant Iwanus with the purpose of tarnishing Plaintiff Miranda's professional reputation.

39. That Defendant Iwanus engaged in several communications, as demonstrated herein, which imputed misconduct regarding Plaintiff Miranda's trade, profession, office, or occupation.

Appellants' App. Vol. II p. 17.

Miranda, in her brief, contends that there are "four statements all written that were defamatory as to [Miranda]." Appellee's Br. p. 19. Those statements are: (1) the email, which Miranda contends is "missing," between Iwanus and Sampson in which Iwanus calls Miranda "un[]ethical;" (2) the email from Grata to Sampson alleging that "[a]sking Registration to wait to arrive a patient is un[]ethical;" (3) the statement on the notice of corrective action dated July 23, 2015; and (4) the notice of termination dated July 29, 2015. *Id.* at 19-20. Later in her brief, Miranda contends that a fifth statement made from one St. Mary's employee to another regarding Miranda's termination also serves as the basis for her defamation claim. *See id.* at 22-23.

[34] Defendants argue that Miranda does not list the allegedly defamatory statements in her complaint, which is contrary to the pleading requirements for

defamation. In the alternative, Defendants argue that Miranda admitted to the conduct she complains is defamatory, and finally, that the qualified privilege of common interest protects the statements made by Defendants and their employees with regard to Miranda's employment.

[35] Miranda's complaint alleges claims of defamation, libel, and slander. Her brief, however, focuses on defamation more broadly. Both slander and libel are species of defamation. *See Branham v. Celadon Trucking Services, Inc.,* 744 N.E.2d 514, 522 (Ind. Ct. App. 2001) ("Libel is a species of defamation under Indiana law"), *trans. denied; see also Branaman v. Hinkle,* 307 N.E. 546, 548 (Ind. 1894) (finding that false defamatory words if written are libel, and if spoken, are slander). A finding of truth or qualified privilege, both of which Defendants argue, can defeat defamation generally in certain circumstances, and thereby defeat libel or slander. *See* Indiana Code Section 34-15-1-2 ("In an action for libel or slander, the defendant may allege: [] the truth of the matter charged as defamatory"); *see also Melton v. Ousley,* 925 N.E.2d 430, 439 (Ind. Ct. App. 2010) ("Truth is a complete defense to defamation.") (citations omitted); *see also Bals v. Verduzco,* 600 N.E.2d 1353, 1356 (Ind. 1992) (finding that qualified privilege is a defense to a defamation action).

[36] In order to determine whether Defendants are entitled to summary judgment on their claims, we must consider the statements themselves. On March 19, 2015, an email from Alexandra Neyhart to Rebecca Borkowski indicated that Miranda was upset with a registration employee because the employee "arrived" a patient before Miranda was ready. Specifically, the email stated:

> When [Miranda] came back she got upset with me because I had already arrived him as chest pain and she wanted me to wait to enter it till [sic] she was there so she could be within the 10[-] minute window frame [to perform an EKG] and since I didn't she only had 6 minutes to do it. This isn't the first time she has asked me to wait to press enter for it to be in the 10[-]minute time frame.

Appellants' App. Vol. III p. 189. Kelly Grata received the email and forwarded it to Sampson and Linda Greer. Grata stated, "Asking Registration to wait to arrive a patient is un-ethical. This is not the first complaint that I have received regarding [Miranda] and her telling registration how to do their job at the front desk." *Id.*

[37]    After being faced with these allegations, Miranda sent a follow-up email to Sampson and stated that she "do[es] not deny doing this," but denied that her conduct was unethical. *Id.* at 191. Later, Miranda stated, "I had even informed the registration employees that I had miss-informed [sic] them and informed them the correct manner that Linda and you expected." *Id.* at 192. Miranda also claims that, during the April meeting with Sampson, Sampson showed her an email allegedly from Iwanus containing a statement that Miranda was unethical. Defendants have denied that Iwanus sent such an email calling Miranda "unethical." This email, which Miranda contends is a "missing

email," is important to Miranda because, as she argues, "it was the first time that the term 'un-ethical' was directed towards Miranda."[4]  Appellee's Br. p. 19.

[38]   The corrective action report, given to Miranda during the July meeting, states:

> On 7/20/15 2 separate occasions occurred whereby Ms. Miranda requested or directed registration personnel not to arrive a patient into the BD flow until she was able to consult over the chief complaint.  One patient was experiencing chest pain and the other [s]hortness of breath.  The chest pain patient KM was visibly in distress and yet Ms. Miranda insisted that the clerk not proceed, thus delaying intervention.  The delay was approximately 5 minutes at which time 21:42 registration waited no longer and care was initiated within 2 minutes 21:44 by the triage nurse.  The patient arrived at 21:37.  The documented pain level during triage was 10 in left chest jaw and shoulder.  The B/P was 143/129.  The 52 yo patient had extensive cardiac history including a pacemaker.  The second patient complaining of shortness of breath had a saturation of 91%.  There was no delay in registration or treatment, but there was a request by Ms. Miranda to delay because she was attending to another patient.  The triage nurse of record had acknowledged and documented Ms. Miranda directing the registration staff not to register patients on 2 separate occasions.  This is the second occurrence of this issue in the last 4 months.  The first anecdotal [sic] occurred on 2/16/15 and was addressed on 4/2/15.

Appellants' App. Vol. III p. 163.

---

[4] When asked about this at her deposition, Miranda stated: "Umm, [Iwanus] did not give – send a copy of the email to my supervisor.  Instead of discussing the situation with my supervisor, sending the email, she directly sent the email to her supervisor and cc'd it to the chief of nursing officer.  So my supervisor was caught – my manager, Greg Sampson, was caught off guard himself about the situation."  Appellant's App. Vol. II p. 179.  Still, Iwanus and St. Mary's contend Iwanus did not send this email.

[39] The corrective action report was updated to reflect Miranda's ultimate termination. The "work rule violation" listed was: "Patient Safety Violation – Delay of patient care and treatment. Patient endangerment." *Id.* at 184. The narrative on the corrective action report states:

> After further review, based on the event outlined in the attached Investigative Suspension/subject to discharge issued on 7/23/15, Ms. Miranda's employment as a RN Liaison at St. Mary's Medical will be terminated effective 7/29/15.

*Id.* Miranda stated that she does not believe the emails were published to anyone outside of the St. Mary's system, and there is no evidence the emails, corrective action report, or any statements regarding Miranda was shared with anyone outside of St. Mary's.

[40] Finally, at her deposition, Miranda contended there were several statements made about her employment status after her termination by different St. Mary's employees. Miranda claimed that Mendoza, a registration employee, told Miranda that Iwanus told Miranda Davis, another registration employee, that Miranda was terminated "not due to only that incident in July, but due to several write-ups."[5] *Id.* at 88. Miranda also contends that registration

---

[5] When asked to explain this allegation, Miranda stated: "[Iwanus] did talk to her registration employees about not providing character letters in my defense." Appellant's App. Vol. II p. 88. When asked how Miranda was aware of this, she stated that she was "told by one of the registration employees. I don't recall the name." *Id.* Miranda also contends that the "several write-ups" comment was not "word-by-word;" however, we address the comment as it was characterized in the designated evidence. *See* Appellee's App. Vol. II p. 104.

employees were told not to provide character letters in Miranda's defense; however, Miranda does not point to any specific statements and does not "recall the name" of the person who told her this statement. Appellee's App. Vol. II p. 104.

[41] "Qualified privilege exists as a defense to defamation in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs." *Harris,* 49 N.E.3d at 646 (citing *Bals,* 600 N.E.2d at 1356)*.* "This defense applies to communications 'made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty.'" *Id.* (quoting *Bals,* 600 N.E.2d at 1356). "Intracompany communications regarding the fitness of an employee are protected by the qualified privilege." *Id.* "Absent a factual dispute, whether a statement is protected by qualified privilege is a question of law." *Bals,* 600 N.E.2d at 1356. Once a defendant has proven qualified privilege, "the plaintiff has the burden of overcoming that privilege by showing that it has been abused." *Williams v. Tharp,* 914 N.E.2d 756, 762 (Ind. 2009).

[42] Regarding the statements made in the corrective action report, and the emails between the St. Mary's employees, the designated evidence clearly demonstrates the statements were protected by qualified privilege. The communications were purely intracompany and directly related to Miranda's

fitness for employment.[6]  Despite the contentions in her complaint, in the designated evidence, Miranda admitted she had no evidence that the statements were relayed outside of the St. Mary's system.  The emails themselves also demonstrate that they remained inside the hospital system.  In other words, the communications were relayed purely intracompany so that St. Mary's could evaluate the work of its employees.

[43]  Ultimately, St. Mary's, as Miranda's employer, correctly considered the conduct of its employees as it relates to patient care.  *See Board of School Com'rs of City of Indianapolis v. Pettigrew,* 851 N.E.2d 326, 331 (Ind. Ct. App. 2006) (stating that intracompany communications regarding the fitness of an employee are protected by qualified privilege "in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs") (citations omitted), *trans. denied.*  The designated evidence demonstrates that St. Mary's kept these communications within the system.  Accordingly, Defendants proved that the qualified privilege protected the communications Miranda contends are defamatory.

[44]  Miranda also alleges that other statements, specifically about her employment status, were defamatory.  At her deposition, Miranda claimed that Iwanus told a registration employee that Miranda was terminated "due to several write-

---

[6] For this reason, we dismiss Miranda's argument regarding a "missing email" authored by Iwanus.  *See* Appellee's Br. p. 19.  Iwanus was a St. Mary's employee, and accordingly, had she authored the email calling Miranda "unethical" instead of Grata, who appears to be the actual author of the email, the communication still would have been protected by qualified privilege.

ups."[7]  Appellants' App. Vol. II p. 88.  The designated evidence demonstrates that this is true.  In March, Miranda was cited for improperly asking registration employees to delay "arriving" patient times, which Miranda admitted to doing.  Miranda was subsequently cited twice in July for the same offense.  "Truth is a complete defense in civil actions for defamation." *Melton v. Ousley,* 925 N.E.2d 430, 437 (Ind. Ct. App. 2010).  Miranda did in fact have more than one allegation of asking registration employees to delay "arriving" patient times, and the designated evidence demonstrates as much.

[45]  Accordingly, Defendants established that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law on the issues of libel, slander, and defamation.  The trial court erred in failing to grant summary judgment in favor of Defendants on these counts.

### C. Negligence

[46]  Defendants also contend the trial court erred by denying their motion for summary judgment on Miranda's claims of negligence.  Miranda's negligence claim alleges that Defendants, and specifically Iwanus, owed Miranda "a duty to act reasonably under the circumstances."  Appellants' App. Vol. II p. 18.  Miranda claims that Iwanus breached that duty by:

---

[7] Miranda learned this from one of her former co-workers who repeated the statement to Miranda.

i.      Disseminating false information imputing negative light upon [Miranda's] professional reputation;

ii.     Falsifying reports regarding [Miranda's] work-product; [and]

iii.    Harassing and harrying [Miranda] during [Miranda's] employment with Community and/or St. Mary's.

*Id.* As a result, Miranda alleges that she suffered humiliation, reputational harm, loss of employment with Community and/or St. Mary's, pain and suffering, and that her nursing license was jeopardized. *See id.* Finally, due to Iwanus' employment with St. Mary's and/or Community, Miranda contends that St. Mary's and Community are liable under the doctrine of respondeat superior. *See id.* at 19. Miranda also contends that St. Mary's and Community breached a duty owed to Miranda by:

i.      Disseminating false information imputing negative light upon [Miranda's] professional reputation;

ii.     Negligently failing/refusing to abide by rules and regulations ratified by St. Mary's and/or Community regarding Corrective Action;

iii.    Terminating its employment with [Miranda] without a thorough investigation;

iv.    Negligently relying and disseminating false information in conjunction with its termination of [Miranda].

*Id.*

Defendants argue that Miranda's "allegations are an artful attempt to circumvent her status as an at-will employee under Indiana law and do not stated [sic] a cognizable claim under Indiana law." Appellants' Br. p. 16. Further, Defendants argue that, "As for the duty of reasonable care, [Defendants] can find no case that imposes such a duty on an employer, save for the duty to provide a safe workplace, not at issue in this case." *Id.*

In her brief, Miranda does not appear to make a separate negligence argument, but instead incorporates the argument into her claim of defamation. Specifically, Miranda argues:

> Should this court determine that the above facts do not constitute actionable defamation of character, they most certainly establish the claim of negligent misrepresentation. Pursuant to the Restatement (Second) of Torts Sec. 552 (1997): "One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused by them by their justifiable reliance upon the information."

*Id.* at 24. Miranda then goes on to continue her argument related to defamation.

We assume that Miranda is arguing the tort of negligent misrepresentation. Negligent misrepresentation has been applied in the employer-employee context, but not in the way in which Miranda alleges. "[I]n order to establish

negligent misrepresentation, a plaintiff must establish that the person making the representations was under a duty not to misrepresent the information." *Darst v. Illinois Farmers Ins. Co.,* 716 N.E.2d 579, 584 (Ind. Ct. App. 1999). "Thus, we can only assume that both the breach of a duty to provide accurate information and negligent misrepresentation would be established by a showing that a person, under a duty to supply accurate information, fails to exercise reasonable care in doing so and as a result the plaintiff, who justifiably relied on the information, was damaged." *Id.* at 584-85.

[50] First, the designated evidence demonstrates that Miranda admitted, at least once, to the misconduct of which she was accused and that she asked registration employees to delay "arriving" patient times. On this alone, Miranda cannot prove that Defendants supplied false information. Regardless, negligent misrepresentation between an employee and employer does not apply in this context. In *Darst,* our court summarized our previous decision in *Eby,* where:

> an employee sought damages from his employer for negligent misrepresentation after the employer falsely represented that there was a job for the employee in Florida, causing the employee and his wife to relocate from Indiana to Florida. Upon his arrival in Florida, the employee was told that there was no employment for him. . . . The court determined that the employer had a duty to its employee, and found that the facts could constitute a breach thereof in conformance with the tort of negligent misrepresentation.

*Darst,* 716 N.E.2d at 583-84 (citing *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 629-30 (Ind. Ct. App. 1983)) (internal citations omitted), *trans. denied*.

[51] Miranda's case is distinguishable from *Eby* in that she has not alleged that she detrimentally relied on any false statements made by her employer. The tort of negligent misrepresentation cannot be extended to the facts of this case. Accordingly, Defendants established that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law on the issue of negligence. The trial court erred in failing to grant summary judgment in favor of Defendants on these counts.

### D. Tortious Interference with Contractional Relationship/Business Relations

[52] Miranda's tortious interference claims appear to be directed at Iwanus. Miranda alleges that she had a contract with St. Mary's and Community, of which Iwanus was aware, and that Iwanus induced a breach of contract by making false statements about Miranda. Alternatively, Miranda claims that a valid business relationship existed between Miranda and St. Mary's and Community, that Iwanus was aware of this business relationship, and that Iwanus intentionally interfered with that relationship. Miranda argues that her damages based upon termination of employment, consisted of reduced wages in subsequent employment, substantial reputational harm, pain and suffering, and emotional distress.

[53] Because we have concluded that Miranda did not have a contract for employment, we need only evaluate Miranda's tortious interference claim with regard to her potential business relations. "An at-will employee 'must be able to expect that his continued employment depends on the will of his employer and not upon the whim of a third[]party interferer.'" *Boys and Girls Clubs of Northwest Indiana,* 845 N.E.2d at 138 (quoting *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n,* 571 N.E.2d 282, 285 (Ind. 1991)). "Such an employee may bring a claim for tortious interference provided that, in addition to demonstrating the standard elements of the tort, she is 'prepared to show that the defendant interferer acted intentionally and without a legitimate business purpose.'" *Id.*

[54] First, we note that no evidence exists that Iwanus interfered with Miranda's business relationship. While Miranda claims that Iwanus authored an email that called Miranda "unethical," it was demonstrated that Grata referred to Miranda's conduct as "unethical;" not Iwanus. *See* Appellants' App. Vol. III p. 189. Miranda cannot attempt to create a genuine issue of material fact with regard to Iwanus' authorship of the email by merely stating as much. *See Beatty v. LaFountaine,* 896 N.E.2d 16, 20 (Ind. Ct. App. 2008) ("guesses, supposition, and conjecture are not sufficient to create a genuine issue of material fact to defeat summary judgment") (citations omitted), *trans. denied.*

[55] Furthermore, the designated evidence demonstrates that Miranda was terminated for violating a St. Mary's policy that jeopardized patients on more than one occasion by asking registration employees to delay "arriving" patient times. The designated evidence indicates that the decision to terminate

Miranda was entirely the decision of the employer and was not induced by a third-party interferer. Accordingly, Defendants established that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law on the issue of tortious interference. The trial court erred in failing to grant summary judgment in favor of Defendants on these counts.

[56] Finally, we note that Miranda cannot succeed on her injunctive relief claim, because she has failed on the merits here. It appears that some of Miranda's requests for injunctive relief are only for temporary relief during the pendency of this action, whereas other requests are for a more permanent solution. In either case, an individual must prove that they are either likely to be successful on the merits, for temporary injunctions, or were successful on the merits, for permanent injunctions. *See Ferrell v. Dunescape Beach Club Condominiums Phase I, Inc.,* 751 N.E.2d 702, 712-13 (Ind. Ct. App. 2001). Because Defendants have succeeded on each of Miranda's claims, she is not entitled to injunctive relief because she cannot prove that she is likely to be or has been successful on the merits.

[57] Defendants were entitled to summary judgment on all of Miranda's claims based on the designated evidence. We note that the trial court issued a brief order denying summary judgment and certified the order for interlocutory appeal sua sponte to "allow" this court to "deal with" the legal issues surrounding summary judgment. Summary Judgment Tr. p. 18. We are perplexed by the trial court's statement that he would "give [this court] work[,]" shirking its duties and essentially punting to this court to serve as the court of

first review. *Id.* That is not the role of our court. The trial court erred by denying Defendants' motion for summary judgment.

## Conclusion

There are no genuine issues of material fact, and the Defendants are entitled to judgment as a matter of law. The trial court erred by denying Defendants' motion for summary judgment. Accordingly, we reverse and remand.

Reversed and remanded.

Baker, J., and May, J., concur.